## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

YARIEL RODRIGUEZ, LISBET CORDERO ROMERO, and
their conjugal partnership,                                          Civ. Num. 15-

Plaintiffs

                                                    Re:    Civil Rights Violations
vs.                                                         Preliminary Injunction
                                                            Declaratory Judgment

THE PUERTO RICO ELECTRIC POWER AUTHORITY
 JORGE HERNANDEZ PEREZ, ZORAIDA FUENTES            PLAINTIFFS DEMAND
 MOURE and their conjugal partnership, in his personal   TRIAL BY JURY
And Official capacities, JUAN ALICEA FLORES, JANE
DOE and their conjugal partnership in his personal
And official capacities, VICTOR M. OPPENHEIMER
SOTO, SUSAN ROE, and their conjugal partnership, in his
personal and official capacities, MARIA M. MENDEZ RIVERA,
JOHN ROE, and their conjugal partnership, in her
personal and official capacities, DAVID MELENDEZ, JANE DOE
and their conjugal partnership in his personal and official
capacities, MANUEL PEREZ SOLER,
MARIA TERESA ADAMES AQUINO, and their
conjugal partnership, ANGEL FIGUEROA JARAMILLO,
SUSAN ROE and the conjugal partnership formed by
them, JOHN AND JANE ROE and their conjugal
partnership, INSURANCE COMPANIES A, B, and C

Defendants
_____

### COMPLAINT

**TO THE HONORABLE COURT:**

COME NOW plaintiffs Yariel Rodriguez, Lisbet Cordero Romero, and their conjugal

partnership, through their undersigned counsel, and respectfully ALLEGE and PRAY as

follows:

1

**INTRODUCTION**

This case is the last of series of cases filed against these same defendants based on the same nucleus of operative facts. In August of 2013, defendants conspired to accuse plaintiff and a group of others falsely of having "stolen" government time and "falsified" government records based on the way those employees completed their attendance records. Having scared the union employees thoroughly, defendants then coerced them to "confess to their crimes' and provide sworn statements against their supervisors in order to be reinstated to their jobs. The primary target of this scheme was the supervisor Nydia Soto, who counsel for the UTIIER described as an effective fundraiser for the New Progressive Party. Defendants sought to get Ms. Soto fired and replace her with Carlos Arroyo, the son of a Popular Democratic Party supporter, who had allegedly paid $15,000 so that his son could be assigned to a supervisory position.

Defendants achieved their goal, but not all of the union members went along with the scheme. Orlando Olivencia, who got pressure from Fortaleza on down, was the first brave soul to resist. Jose Marcelo Rivera, an NPP member who had been a primary candidate for the Puerto Rico House of Representatives, was not even offered the opportunity to incriminate himself and provide forced testimony. Oscar Colón and Omar Lugo then stepped forward, providing the key information that co-defendant Oppenheimer admitted to having participated in planning and executing the scheme to violate the union members' constitutional rights, hoping to cover his tracks by punishing Mr. Colón, who is in a wheelchair and Mr. LaSalle who had been suspended for 20 years before being reinstated. Both Colon and LaSalle are Populares, and their

2

inclusion was intended to and did frighten the union members into providing the sworn statements. [Mr. Colon is a wheelchair; Mr.LaSalle had been suspended for decades. The message was clear: we will do what we want and the law be damned.] Next, Edwin Rodriguez came forward and averred that he had been coerced to provide a statement and incriminate himself. After the first Mr. Rodriguez came Jorge LaSalle, who provided the information that more than just garden variety political discrimination case, there was reason to believe that Ms. Soto had been targeted so that her position could be awarded to Mr. Arroyo in exchange for a $15,000 payment. Yariel Rodriguez, plaintiff herein, initially sought to intervene in Edwin Rodriguez's case, which was the most similar one to his. When the Court denied that motion, he decided to present the instant case.

JURISDICTION

1. This suit is brought and jurisdiction lies pursuant to 42 U.S.C. §§ 1983, 1988, as amended, and the First, Fifth and Fourteenth Amendments of the United States Constitution.

2. This Honorable Court has jurisdiction over plaintiff's federal claims under 28 U.S.C. 1331 and 1343. Its jurisdiction over state law claims is invoked pursuant to the doctrine of pendent or supplemental jurisdiction. 28 U.S.C. 1367. The following local laws are invoked: the Due Process Clause of the Puerto Rico Constitution, Section 4 of the Puerto Rico Constitution, Articles 1802 and 1803 of the Puerto Rico Civil Code, and 32 L.P.R.A. § 3115.

3. The proper venue for this case lies in this Court, as the defendants all reside in

Puerto Rico and the causes of action took place here. 28 U.S.C. 1391(b). All of the actions of Jorge Hernandez Perez, Juan Alicea Flores, Victor Oppenheimer, Maria M. Mendez, and David Melendez were taken under color of law, and the remaining defendants conspired with the public officials to deprive plaintiffs of their civil rights.

**Right to a Preliminary Injunction**

4. In order for this Court to grant a preliminary injunction, plaintiffs must show irreparable harm, the likelihood of prevailing on the merits, that the balance of the equities weighs in their favor, and that the public interest will be served by the issuance of the injunction. *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 20 (2008).

5. The public officials' actions in conspiring with the remaining defendants to initiate and maintain the baseless decisions to suspend and then discipline plaintiff without grounds and in violation of his fundamental constitutional rights have caused and are causing plaintiffs significant and irreparable harm.

6. The harm includes emotional distress, and severe harm to the reputation of Mr. Rodriguez, whose only "sin" was to have been assigned to work at the Isabela office of PREPA for a few days, where defendants sought to dismiss the New Progressive Party supervisors so that defendants could replace those supervisors with people from the Popular Democratic Party and the NPP activist Jose Marcelo Rivera, as they did by replacing the supervisor Nydia Soto with the Popular party activist Alfonso Villafañe, and supervisor Jose Feliciano Bolet with

4

the Popular party activist Maritza Santiago Rosa.

7. Defendants dropped all charges against Mr. Rodriguez, but they still expected and expect him to testify against his supervisor, Jose Torres, against his will.

8. The PREPA defendants in conspiracy with the UTIER defendants used Mr. Rodriguez as a pawn in their scheme to secure the plum jobs of NPP supervisors for members of the Popular Democratic Party. In the process, all defendants violated Mr. Rodriguez's First, Fifth and Fourteenth Amendment rights. Mr. Rodriguez has suffered and continues to suffer irreparable harm as a result of defendants' actions.

9. It is well settled that the dismissal of career employees to replace them with political hacks violates the First Amendment. *See eg., Branti v. Finkel,* 445 U.S. 507, 518 (1980); *Martinez Velez v. Rey Hernandez,* 506 F.3d 32, 39 (1st Cir. 2007); *Jimenez Fuentes v. Gatzimbide,* 807 F.2d 236 (1st Cir. 1986). It is also well settled that a person may not be obligated to testify against another as a condition of employment and that a person does not lose her First Amendment rights by virtue of public employment. *Lane v. Franks,* ___ U.S. ___, 134 S.Ct. 2369, 2380 (2014)

10. PREPA, acting through Mr. Alicea Flores, Mr. Oppenheimer Soto, Mr. Hernandez Perez, Ms. Mendez, and Mr. Melendez in conspiracy with UTIER leadership, dismissed plaintiff, even though plaintiff had not violated PREPA's rules, with untimely charges in order to be able to dismiss the NPP supervisors, and Mr. Rivera and to pressure plaintiff to provide a sworn statement against Mr. Torres

5

to obtain the illegal goal of substituting Mr. Torres with a member of the Popular

Democratic Party.

11.  Plaintiff is likely to prevail in this litigation. *Winter v. Nat. Res. Def. Council,* 555

U.S. at 20. Defendants violated the Fifth Amendment by threatening to suspend

plaintiff without pay based on plaintiff's refusal to waive his right not to incriminate

himself without offering him immunity.

12.  Defendants conspired to violate the Collective Bargaining Agreement by filing

the charges after the established deadline; they conspired to violate an

arbitrator's decision and a determination of PREPA's Legal Division that security

guards are not competent to determine attendance, and they required plaintiff to

give forced testimony against Mr. Torres in exchange for reduced punishment

and then had him sign an invalid release agreement. *Gardner v. Broderick,* 392

U.S. 273 (1968)(unconstitutional to condition continued public employment on

waiver of Fifth Amendment rights), *see also Oubre v. Entergy Operations, Inc.,*

522 U.S. 422, 429 (1998)(Employment discrimination releases must advise the

party of right to consult counsel, provide at least 21 days to consider the waiver

of claims, and 7 days to reconsider.)

13. In the case of Orlando Olivencia and Jose Marcelo Rivera, various witnesses

called by PREPA and the injunction hearing in that case admitted that the security

guards' time notations were inaccurate during the relevant period.

14.  Although co-defendant Hernandez testified under oath during the injunction

hearing that the first notice he had of the incongruencies between the guards'

6

entries and employees' payroll records was on July 11, 2013, he has since testified under oath that on June 25, 2013 Nydia Soto must have known that he was investigating her conduct regarding the UTIER employees' attendance records.

15. The public interest favors this preliminary injunction to provide plaintiff with the remedies requested herein, particularly given the pattern of unconstitutional behavior by PREPA government officials and the UTIER defendants' cooperation with that unconstitutional conduct.

16. This Court has even seen this particular *modus operandi* of requiring PREPA employees to waive their Fifth Amendment rights in order to keep their jobs. Olivencia and Rivera v .PREPA, 13-1844 (PAD-MEL), Lugo and Colón v. PREPA 14-1618 (PAD), Rodríguez v. PREPA 14-1753 (CCC), LaSalle v. PREPA 14-1861 (PAD).

17. Miguel Cordero, PREPA's former executive director, admitted publicly that PREPA fabricated cases against employees because of their political ideology, and UTIER's president, defendant Figueroa Jaramillo has confirmed that as recently as August 8, 2014.

19. When plaintiffs' fundamental constitution rights are violated, especially impingement of rights to free speech and free association, even the briefest of such deprivations constitutes irreparable harm. *Vaqueria Tres Monjitas, Inc. v. Irizarry,* 587 F.3d 464, 484 (1st Cir.2009).

7

III. PARTIES

20. Plaintiff, Yariel Rodriguez Rivera is of legal age, a United States citizen, married to Lisbet Cordero Romero, with whom he forms a conjugal partnership, and a resident of Moca, Puerto Rico. At all times relevant to the instant Complaint, plaintiff was an individual protected by the laws invoked in this Complaint.

21. Defendant, the Puerto Rico Electric Power Authority is sued for injunctive relief only, not money damages.

22. Defendant Juan Alicea Flores is sued in his official and personal capacities for conspiring with the remaining co-defendants to violate plaintiffs' rights to due process under the First, Fifth and Fourteenth Amendments, plaintiffs' Fifth and First Amendments right s not be to coerced into making statements, and Mr. Rodriguez's First Amendment right to refrain from testifying against Jose Torres, all of which resulted in plaintiff being suspended with pay, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Mr. Alicea Flores also violated plaintiff's rights under the Puerto Rico Constitution. Mr. Alicea is a member of the Popular Democratic Party.

23. Defendant Victor Oppenheimer Soto, Esq. is sued in his official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Jorge Hernandez Perez, David Melendez, Esq., Manuel Perez Soler, Maria Mendez, and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the First, Fifth and Fourteenth Amendments, plaintiffs' First and Fifth Amendment rights not be to coerced into false statements, and to abstain from testifying

8

against Jose Torres, all of which resulted in plaintiff being suspended with pay, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Mr. Oppenheimer also violated plaintiffs' rights under the Puerto Rico Constitution. Mr. Oppenheimer Soto is a leader of the PREPA organization Energia Popular, a political partisan group of the PDP.

24.    Defendant Maria Mendez, Esq. is sued in her official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Jorge Hernandez Perez, Victor Oppenheimer Soto, Esq., David Melendez, Esq., Manuel Perez Soler, and Angel Figueroa Jaramillo to violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments, plaintiffs' Fifth Amendment rights not be to coerced into making statements, and Mr. Rodriguez's First Amendment rights to refrain from testifying against Jose Torres, all of which resulted in plaintiff being suspended, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Ms. Mendez also violated plaintiffs' rights under the Puerto Rico Constitution and defamed them on the radio program Noti Uno. On information and belief, John Roe is Ms. Mendez's husband, with whom she forms a conjugal partnership. Ms. Mendez is a member of the Popular Democratic Party and had been the Secretary of the PREPA Board of Directors at the same time she is Director of Human Resources of PREPA. According to an October 15, 2013 Vocero newspaper article, in the past Ms. Mendez received a complaint from Government Ethics Office when she was the PREPA Legal Consultant but OCAM office granted a retroactive waiver

9

from 1999 until 2003. Mendez Rivera, however, violated the law in 2005 (case number 06-80) for the same thing. Ms. Mendez did not request a waiver to the State Department even though her husband had contracts with the Government Development Bank (GDB) and the Courts Administration. For this ethical violation Rivera Mendez paid a fine of $ 2,000. The newspaper's source said that Ms. Mendez Rivera is the primary liaison between Fortaleza and PREPA and exerts an important role in giving the nod to renewable energy projects within the corporation. In this administration no renewable energy projects have been approved.

25. Defendant Jorge Hernandez Perez is sued in his official and personal capacities for conspiring with co-defendants Juan Alicea Flores, Esq., Victor Oppenheimer Soto, Esq., David Melendez, Esq., Manuel Perez Soler, Maria Mendez, Esq., and Angel Figueroa Jaramillo to violate plaintiff's rights to due process under the Fifth and Fourteenth Amendments, plaintiff's First and Fifth Amendment rights not be to coerced into making statements, all of which resulted in plaintiff being suspended with pay, threatened with dismissal, and then disciplined. In conspiracy with the other defendants, Mr. Hernandez also violated plaintiffs' rights under the Puerto Rico Constitution. On information and belief, Zoraida Fuentes Moure is Mr. Hernandez Perez's wife, and the two of them form a conjugal partnership. Mr. Hernandez Perez is a member of the Popular Democratic Party and has worked in the Quebradillas office of PREPA, where he knew plaintiff. Mr. Hernandez Perez altered the payroll records of employees of

10

the Popular Democratic Party, so it did not look like they had the discrepancies

Mr. Rodriguez and other employees had. Mr. Hernandez Perez also authorized

per diem allowances for these same employees in violation of PREPA's policies.

26. Defendant Manuel Perez Soler is sued for conspiring with co-defendants Alicea,

Oppenheimer, Mendez, Hernandez Perez, Melendez, and Figueroa Jaramillo to

violate plaintiffs' rights to due process under the Fifth and Fourteenth Amendments,

plaintiffs' First and Fifth Amendment rights not to be coerced into making

statements, and Amendment rights to belong to the political party of his conscience,

all of which resulted in plaintiff being suspended without pay, threatened with

dismissal, and then disciplined. On information and belief, Jane Doe is Mr. Perez's

wife, and the two of them form a conjugal partnership. Mr. Perez Soler also violated

plaintiffs' rights under the Puerto Rico Constitution. Mr. Perez was a Popular

Democratic Party city council member in the prior administration of Mayor Carlos

Delgado in violation of the Collective Bargaining Agreement between PREPA and

UTIER.

27. Defendant Angel Figueroa Jaramillo is sued for conspiring with co-defendants

Alicea, Mendez, Oppenheimer Soto, Hernandez Perez, Melendez, and Perez Soler

to violate plaintiffs' rights to due process under the Fifth and Fourteenth

Amendments, plaintiffs' First and Fifth Amendment rights not to be coerced into

making statements, all of which resulted in plaintiff being suspended with pay,

threatened with dismissal, and then disciplined. On information and belief, Susan

Roe is Mr. Figueroa Jaramillo's wife, and the two of them form a conjugal

11

partnership. Mr. Figueroa Jaramillo also violated plaintiffs' rights under the Puerto Rico Constitution.

28. Defendant Insurance Companies A, B, and C are one or more insurance companies that may have issued and have in effect policies of insurance for the risks that result from the acts stated in this Complaint, the identity of which are unknown at present.

29. Defendants John Doe, Jane Doe, John Roe and Jane Roe, and their respective conjugal partnerships, are persons responsible for the acts and damages alleged in the instant case whose identities are unknown at this moment.

III.    FACTS

**Who Plaintiff Is**

30. Mr. Rodriguez Rivera began to work at PREPA on -----, during a Popular Democratic Party administration.          .

31. Mr. Rodriguez Rivera has not been an active participant in any party.

32. The vast majority of PREPA's employees belong either to the Energeticos del NPP or to Energia Popular, the Popular Democratic Party organization of PREPA employees.

33. Who belonged to each political partisan group was common knowledge at PREPA, but Mr. Rodriguez Rivera was not a party activist.

34. PREPA employees' time records are recorded by their sign in/sign out sheets at the job. The procedure for accrediting payroll records does not mention the controlled access system because the controlled access system is not used to

verify attendance.

35.  In an arbitration decision there is a ruling on the access control system where PREPA stipulated with UTIER not use the access control system to discipline employees or dock them for time allegedly not worked.

36. The Director of PREPA's Legal Division has determined that controlled access records are not to be used to determine the arrival or departure times of PREPA employee.

37. The records of security guards are unreliable because employees do not always arrive to work in their cars; they may be dropped off by a family member, etc. and they may leave the Isabela premises in their personal vehicles, but still be involved in work activities.

38. Furthermore, PREPA witnesses have admitted in sworn testimony before this Honorable Court that the security guards at the Isabela guardhouse lack an accurate chronometer prior to July 2013. All of Mr. Rodriguez's alleged tardy arrivals occurred prior to July 2013. April 13 and May 4, 2013, the only two days when Mr. Rodriguez Rivera was accused of having had discrepancies of 60 minutes, he was entitled to an hour of traveling time because of his assignment to the Arecibo office, and he only had a total of discrepancies of 60 minutes. In the opposition to the motion for a preliminary injunction Orlando Olivencia and Jose Marcelo Rivera, co-defendant Hernandez Perez, counsel for the PREPA defendants in their official capacities filed a pleading subject to the strictures of Rule 11 in which he averred that no PREPA who had less than 500 minutes of

13

discrepancies was punished. At the preliminary injunction hearing, co-defendant Hernandez Perez testified that no PREPA employee with less than 400 minutes was punished. Yet the PREPA defendants punished Ms. Rodriguez Rivera, who only had 60 minutes of discrepancies.

39. PREPA supervisors met with the private security company on July 11, 2013 to discuss the discrepancies between the information reported by the guards and the facts. As a result of that meeting, the security guard's supervisor acknowledged their errors and agreed to improve their recordkeeping in the future, and PREPA provided the guards with a time clock.

40. The collective bargaining agreement between the Union de Trabajadores de la Industria Electrica y Riego (UTIER) and PREPA provides that any disciplinary action for misconduct must be brought within 30 working days of the employee's supervisor learning of the alleged misconduct.

**The Illegal Summary Suspensions**

41. Mr. Rodriguez Rivera was not at the work on August 19, 2013.

42.  The supervisors Jose Torres Perez, Nydia Soto Quiñones, and Jose Feliciano Bolet, all members of the New Progressive Party, were eventually fired. Defendants eventually replaced Ms. Soto with Alfonso Villafañe, a member of the Popular Democratic Party until she was restored to her position based on PREPA's violations of its procedures and of Ms. Soto's constitutional rights. Plaintiffs have since learned that Jorge LaSalle, who has also sued for violation of his rights, heard that government defendants dismissed Ms. Soto because

14

they had sold her position for $15,000.

43. The vast majority of the PREPA employees on the list to be fired were known members of the New Progressive Party.

44. Plaintiff's co-worker, Orlando Olivencia, called Manuel Perez Soler, the UTIER representative to be present during these disciplinary proceedings, but Mr. Perez Soler refused to come.

45. On information and belief, Mr. Perez Soler already knew the scheme that Mr. Hernandez Perez had concocted with the other defendants to dismiss plaintiffs' NPP supervisors based on fabricated charges from subordinates fearful of losing their own jobs and threatened with criminal prosecution.

46. Mr. Rivera Rodriguez was not at work on August 19, 2013, so he received his letter the following day in Arecibo.

47. In Mr. Rodriguez Rivera's case, the letter stated that "On April 13 and May 4, 2013, you were assigned to work in the Isabela commercial office. The time your personal vehicle exited the parking lot of the Isabel Commercial Office (PREPA), considering that you have the right to traveling time, exceeds the time that you appeared on the payroll as extra time not worked."  The letter so stated, even though Mr. Rodriguez had the right to an hour of traveling time, and both his time sheet and the guards' registry so reflected.

**Instead of Defending Their Members, the UTIER Defendants Add to the Pressure**

48. The UTIER leaders called plaintiff and the other dismissed union members to

15

attend a meeting at the UTIER facilities in Camuy.

49. Shortly after 1:00 p.m., plaintiffs' co-worker Olivencia texted Angel Figueroa

Jaramillo and asked him to call him before a meeting set for 5:00 pm. because

Ms. Nydia Soto told him that she had documents that could get the charges

dismissed against everyone who was suspended that very day.

50. Ms. Soto had a copy of an e mail from July 2013 that demonstrated that

management had been dissatisfied with the recordkeeping of the security guards

because they noted times incorrectly and failed to note the entry and exit of

certain cars. PREPA's witnesses have subsequently admitted that this is true.

51. In the e mail, Maritza Santiago confirmed the meeting that Alfonso Villafañe had

with the management of the security company, admitting that the security guards

were to rectify the recordkeeping errors they had been committing going forward.

52. Ms. Santiago has also admitted under oath that prior to July 11, 2013 the security

guards had no accurate means to determine the time when the PREPA

employees arrived or left the Isabela facilities.

53. All of the allegations against the PREPA workers who were suspended from duty

on August 19, 2013 involved recordkeeping from before July 2013, those most

recent being the end of May 2013. In Mr. Rodriguez Rivera's case, the most

recent allegation was from May 4, 2013.

54. In the days before August 19, 2013 PREPA supervisors from the Popular party

altered records regarding union workers from the Popular party so that it would

appear that they had arrived on time, when they had been late according to the

16

guards' logbook.

55. At the meeting at the UTIER in Camuy, Mr. Figueroa Jaramillo said that he had known that the dismissals were going to occur for the last two or three weeks, and  that in all the time he had been in the union, he had never seen so many employees dismissed from one regional office at a time.

56. Mr. Figueroa Jaramillo also told the suspended workers that the union would not be getting them lawyers for their informal hearings and that they should not hire their own attorneys because in his experience private lawyers only ruined cases; that no one should speak at the informal hearings; and that they should wait for the formal hearings to present exculpatory evidence, but that the formal hearings could take years to be scheduled.

57. In the cases of the only two union workers to request formal hearings, defendants [the PREPA defendants had to reach an agreement with the UTIER defendants for a hearing officer to be chosen], delayed the beginning of the formal hearing for a year to begin and only began as a result of this Court setting a hearing on the injunctive relief sought in that Complaint. The undersigned filed a Motion to Dismiss the charges against Orlando Olivencia and Jose Marcelo Rivera on August 28, 2014. David Melendez first asked for an additional week to respond to the charges and then asserted that he was ill and not working, even though he appeared as sole counsel for PREPA in the administrative proceedings against the supervisors this very week. Counsel for the UTIER also asked for an additional week – without providing any reason – continuing the

17

UTIER's practice of collaborating with PREPA to deprive members of the PNP of their constitutional rights. Although more than a month has passed since the Motion to Dismiss was filed, neither Melendez nor the UTIER has responded to it. Meanwhile, two UTIER members remain jobless as Figueroa Jaramillo had threatened. Two years later, the hearing still has not been held. Again, Figueroa Jaramillo's dire prediction has proved all too true.

58. Fausto Ramos Quiros, Esq., the hearing officer upon whom defendants agreed, stated at the beginning of the formal hearing of Orlando Olivencia and Jose M. Rivera Ramirez that he had been notified that he had to set the formal hearing with a sudden urgency just before the injunction hearing in 13-1844 (PAD-MEL).

59. At the Camuy meeting on August 19, 2013, Mr. Olivencia said that he imagined that the UTIER would be holding a general strike the next day to protest this mass dismissal without cause.

60. Mr. Figueroa Jaramillo responded that the whole matter had to be settled quickly, before the press learned of it because PREPA's image had suffered a great deal recently; he told them that they could be facing criminal charges because they had been accused of stealing time from PREPA, and he instructed all of those present at the meeting not to talk about what had happened with anybody, particularly the media.

61. Mr. Figueroa Jaramillo's conduct in this instance contrasted sharply with his conduct in other labor disputes with PREPA, during which he was always ready to call for a general strike and delighted in making PREPA look bad in the press.

18

Since the August 2013 summary dismissals, the UTIER has called general strikes repeatedly in response to PREPA actions.

62. In addition to trying to silence the union members, Mr. Figueroa Jaramillo further warned them that if criminal charges were filed, UTIER could not defend them.

63. Mr. Figueroa Jaramillo said that he was going to meet with Victor Oppenheimer, Esq., the director of PREPA's legal division, and that he would have to accept whatever Mr. Oppenheimer was willing to offer. Again, Mr. Figueroa's stance in this instance varied sharply from his usual call for strong stands in favor of workers' rights and it was designed to intimidate the suspended workers, most of whom were members of the NPP.

64. Mr. Figueroa Jaramillo also told all the union members at the meeting that for less serious accusations than the charges against them, "El Buho" Marrero had gone to prison. [Senator Marrero was convicted of misappropriating $600.00].

65. Someone at the meeting asked Mr. Figueroa Jaramillo what would happen with their medical insurance, and he said he did not know, that he would try to keep their insurance in place until their formal hearings, but that he could not guarantee that, even though the practice was for union members to keep their PREPA medical plan which a hearing was pending.

66. Mr. Figueroa Jaramillo also told all the union members that if they had any money in their pension plans, that they should take it out quickly because if they left it in, it would be more difficult to withdraw later.

67. Mr. Rivera, the PREPA employee who had tried to stay with Mr. Colon, told Mr.

19

Figueroa Jaramillo that the suspension was obviously political because Mr. Hernandez had not suspended Popular employees who had also left the parking area before the end of the workday according to the guard's logbook since they performed the same jobs at the same time as employees who had been dismissed.

68. When Mr. Rivera said this, Mr. Figueroa Jaramillo got angry and said that everyone knew that he [Mr. Figueroa] was a member of the pro Independence party, and that he was not going to talk about politics.

69. Even though Mr. Figueroa Jaramillo knew or should have known that the suspensions were invalid because they were untimely and violated the Collective Bargain Agreement and the existing arbitrator's decision and that of PREPA's Legal Division, he mocked Mr. Rivera for saying the suspensions were politically motivated. He said angrily to Mr. Rivera that he could not add more people to the bucket because it was too heavy already and if he kept adding weight he was not going to be able to lift it. [Meaning that the union should not be concerned about the dismissals without just cause of plaintiffs' NPP supervisors.]

70. Puerto Rico's appellate jurisprudence is replete with cases of the UTIER defending its members for far more serious charges than the tardiness alleged here. The UTIER has defended union members who have failed drug tests time after time after time, and who have even served prison terms for controlled substances.

71. The UTIER's efforts to coerce union members who were confronted with criminal

20

charges for untimely charges of tardiness is evidence of their conspiring with PREPA to harm NPP members to benefit PDP members.

72. Mr. Figueroa Jaramillo repeated that he had a meeting scheduled with Mr. Oppenheimer the next day at 7:30 am, and that he was going to accept whatever offer Mr. Oppenheimer made.

73. On August 20, 2013 at around 2:30 p.m., plaintiff learned that PREPA had reinstated their co-worker Mairis Gomez because they said payroll had overlooked certain things, so they closed her case. Ms. Gomez was suspended with the other NPP workers on August 19, but PREPA has never revoked her suspension in writing.

74. On August 21, 2013, Mr. Perez Soler met with the UTIER members to inform them of the settlements Mr. Oppenheimer was offering.

75. In the particular case of Mr. Rodriguez Rivera, he had a right to traveling time because he was officially assigned to the Arecibo. Moreover, Mr. Rodriguez Rivera only had a total of 60 minutes of discrepancies, and he did not appear in the original audit, which revealed that all 38 employees assigned to the Isabela had discrepancies.

76. In their Opposition to Motion for Preliminary Injunction in 13-1844, Docket 44, PREPA asserted that it only suspended employees with more than 500 "stolen" minutes, but the PREPA defendants suspended Mr. Rodriguez, for arriving at PREPA for a total of only 60 minutes of discrepancies.

77. Mr. Perez Soler told each of the suspended workers what each had to say in a

21

sworn statement to procure the dismissals of their NPP supervisors, saying that this is what he had negotiated with Mr. Oppenheimer as a condition of their returning to work.

78. When Mr. Perez Soler called Mr. Rodriguez Rivera, Mr. Perez Soler just told him that he had to sign a sworn statement in order to return to work.

79. Mr. Rodriguez Rivera had all the charges against him dismissed, provided that he testified against Mr. Torres.

80. Mr. Perez Soler discussed the conditions to be placed on all the employees in order for them to return to work, as Mr. Perez Soler consulted on the phone with Mr. Oppenheimer.

81. The meeting ended at around 8:15 p.m.

82. Mr. Rodriguez Rivera had been with his wife when he got the phone call with the news of his suspension for theft and altering public documents. People called Ms. Torres and asked if it was true her husband had been fired for fraud. Concerned about their future, in particular because Ms. Torres was unemployed, neither was able to sleep.

83. His co-workers told Mr. Rodriguez that Mr. Figueroa Jaramillo said the formal hearing would take five to six years. Mr. Rodriguez is the primary breadwinner in his family, and his work has been limited to PREPA for the last several years. Given Puerto Rico's contracting economy, the prospect of several years without work for a middle aged man was terrifying, as Mr. Figueroa Jaramillo intended it to be.

22

84. That night Mr. Rodriguez could not sleep thinking of how unjust the procedure had been and also worried about his family's future.

85. Mr. Rodriguez Rivera was concerned about his economic obligations.

**Dismissals without the Due Process of an Informal Hearing and in Violation of the Fifth Amendment.**

86. On August 22, 2014, the suspended employees were called to individual meetings about the charges against them, and Mr. Perez Soler came up to the each of the union members and told them that no one was going to testify at the meetings because it went badly for union members who testified.

87. Mr. Rodriguez Rivera did not have either an investigative meeting or an informal hearing.

88. Mr. Perez Soler told Mr. Rodriguez that he had to sign a statement implicating Jose Torres in order to return to work

89. Mr. Rodriguez Rivera received the sworn statement on August 22, 2014.

90. On August 22, 2013, the PREPA defendants had plaintiff sign a settlement agreement, stating that he would not sue PREPA. The settlement agreement violates federal law in that it does not advise plaintiff that he should consult with an attorney before signing the agreement, it did not provide plaintiff with at least 21 days to consider the agreements, it did not provide plaintiff with at least 7 days to rescind the agreements, and it was not approved by anyone from the office of the Puerto Rico Department of Labor.

91. The Collective Bargaining Agreement between UTIER and PREPA provides that

23

the first time a PREPA employee is accused of repeated tardiness she may

receive a formal warning. The sanction for the second and third time an

employee is found to have been tardy repeatedly is also a formal warning. [The

suspension notice Mr. Rodriguez received referred to his exit times not matching

the guards' records, not his entry times.]

92. Being absent from work without prior permission also warrants a formal warning

for a first offense; a second offense warrants a 40 hour suspension.

93. On September 13, 2014, Mr. Perez Soler met with the other union members

sued by Mr. Feliciano and told them that the UTIER would be providing them with

a defense in that case.

94. On September 19, 2014 in a meeting PREPA called, co-defendant David

Melendez, PREPA's in house counsel, told the PREPA employees that Mr.

Rodriguez and the other PREPA workers should testify against the NPP

supervisors. Mr. Melendez also told the union members that they had never been

threatened with criminal charges, even though both the letters of suspension

asserted that Mr. Rodriguez had committed criminal offenses. Mr. Melendez also

warned the UTIER members at the meeting against telling their attorneys that he

was telling them that PREPA could not refer them for criminal charges in

contradiction of the letters the union members received, and the threats that the

UTIER leaders had made.

24

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**(VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS)**

95. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

96. Because Defendants failed to afford Mr. Rodriguez Rivera due process of law by affording him an informal hearing prior his summary suspension, they violated 42 U.S.C. 1983 with knowing and reckless disregard of said Act's proscriptions.

97. Because Mr. Perez Soler and Mr. Figueroa Jaramillo, in conspiracy with the other defendants refused to consider the exculpatory evidence of Mr. Rodriguez Rivera before the illegal suspension, they conspired to and in fact denied Mr. Rodriguez Rivera due process.

98. Defendants summarily suspended Mr. Rodriguez Rivera without due process.

99. Defendants engaged in policies and practices which willfully, or in the alternative unwillfully, discriminated against the plaintiffs by not affording them due process of law.

100. Mr. Rodriguez Rivera has a property interest in his continued employment of which he cannot be deprived without due process.

101. As a result of the before mentioned, Mr. Rodriguez Rivera is entitled to be paid by defendants the following damages: punitive, emotional, and economic damages of not less than the sum of $500,000.00, plus interest and any other benefits allowed by law.

102. All of the previously mentioned acts of the defendants violated 42 U.S.C. 1983, and the other federal laws previously cited.

103.    Mr. Rodriguez Rivera seeks an apology for the false accusations and asks this

25

Court to order that PREPA is precluded from charging Mr. Rodriguez for any supposed "stolen" time.

## SECOND CLAIM FOR RELIEF
## PUERTO RICO CONSTITUTIONAL DUE PROCESS PUERTO RICO ARTICLE II, SECTION 7

104. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

105. Defendants by the acts previously described in this Complaint, violated the Constitution of Puerto Rico which prohibits the deprivation of property without due process of law. Mr. Rodriguez Rivera seeks an apology and an elimination of any pretense by PREPA of charging him for "stolen" time.

106. Defendants' discrimination has harmed plaintiffs emotionally and economically. The amount of damages exceeds $500,000.00 each.

## THIRD CLAIM FOR RELIEF
## 42 U.S.C. § 1983
## (VIOLATION OF THE FIRST AMENDMENT)

107. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

108. Defendants by the acts previous described in this Complaint, violated plaintiffs' rights under the First Amendment by forcing him to provide testimony.

109. Defendants' discrimination has harmed plaintiffs economically and emotionally, and plaintiffs are entitled to punitive damages for defendants' conspiracy to violate the

26

United States Constitution. The amount of damages exceeds $1,000,000.00.

**FOURTH CLAIM FOR RELIEF**
**PUERTO RICO CONSTITUTION ARTICLE II, SECTION 8**
**PROTECTION AGAINST ATTACKS TO A PERSON'S HONOR, REPUTATION, AND**
**FAMILY LIFE**

110. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same

force and effect as if herein set forth.

111. Defendants by the acts previously described in this Complaint, violated the

Constitution of Puerto Rico, Article II, Section 8, which requires that all persons have a

right to legal protection against abusive attacks against their honor, reputation and

family life.

112. Defendants' aggressive attack on plaintiffs' honor, reputation and family life

has harmed each plaintiff economically and emotionally. The amount of damages

exceeds $500,000.00.

113.    Plaintiffs also seek an apology.

**FIFTH CLAIM FOR RELIEF**
**VIOLATION OF SECTION 1983 OF THE U.S. CODE**
**THE FIFTH AMENDMENT**

114. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force

and effect as if herein set forth.

115.    By conditioning their continued employment on a waiver of their Fifth Amendment

rights not to incriminate himself, defendants violated plaintiff's Fifth Amendment rights.

116.    The amount of damages exceeds $1,000,000.00.

27

## SIXTH CLAIM FOR RELIEF
## VIOLATION OF ARTICLE II, SECTION II OF THE PUERTO RICO CONSTITUTION

117. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

118.    By conditioning his continued employment on a waiver of the right not to incriminate himself, defendants violated plaintiff's rights under the Puerto Rico Constitution not to incriminate himself.

119.    The amount of damages exceeds $1,000,000.00.

## SEVENTH CLAIM
## ARTICLES 1802, 1803 PUERTO RICO CIVIL CODE
### (Mental and Moral Damages)

120. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

121. As a result of the before mentioned acts and omissions, the defendants have directly and intentionally inflicted emotional distress, humiliation, harassment, and mental anguish on the plaintiffs, in an amount in excess of $500,000.00. Ms. Mendez intentionally defamed plaintiffs by saying they had stolen time from PREPA, with the knowledge that her statements were false and with the intention of harming plaintiffs. The plaintiffs haves suffered immensely because of the illegal activities of defendants and are desperate, depressed, and anxious. They have spent endless nights and days of worry, uncertainty and despair. Their severe mental depression and emotional distress has caused severe problems in their lives.

## EIGHTH CLAIM FOR RELIEF
## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF

122. Plaintiffs incorporate as if re-alleged the preceding paragraphs with the same force and effect as if herein set forth.

123. Plaintiffs are suffering irreparable harm each day the false accusations remain in Mr. Rodriguez Rivera's records and the possibility of criminal accusations. Mr. Rodriguez Rivera faces the illegal confiscation of funds to repay time PREPA claims he stole due to defendants' unconstitutional actions. Moreover, as recently as September 2014, co-defendant Melendez was trying to coerce Mr. Rodriguez into testifying against Mr. Torres.

124. The likelihood of success on the merits in this case is high because defendants lack any evidence that plaintiffs violated any of PREPA's rules, much less a rule which would cause harm to the Treasury of Puerto Rico or imminent harm to any person.

125. The balance of the equities favors plaintiffs because defendants have no evidence that they violated any rule because they did not do so and instead worked efficiently and effectively for PREPA.

126. The public interest would be served by granting a preliminary injunction expunging the illegal accusations from the files of plaintiff and ending the threat of criminal accusations.

127.  This Court should also order all defendants to issue a public apology for the unconstitutional disciplinary actions, the coercion in violation of the First Amendment, and Ms. Mendez's defamation.

**TRIAL BY JURY**

128. Plaintiffs demand trial by jury.

WHEREFORE, in view of the foregoing, plaintiff respectfully requests that judgment

be entered against the defendants jointly and severally, as follows:

a) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately,

and prohibit criminal accusations from being filed, and all defendants to pay plaintiffs a

sum in excess of $500,000.00 plus interest as per the First Claim for Relief (Section

1983, deprivation of property without due process of law);

b) Ordering PREPA to expunge plaintiff's records of the false accusations immediately,

and prohibit criminal accusations from being filed, and all defendants to pay plaintiffs a

sum in excess of $500,000.00 plus interest as per the Second Claim for Relief (Due

Process Pursuant to the Puerto Rico Constitution);

c) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately,

and prohibit criminal accusations from being filed, and pay plaintiffs a sum in excess of

$1,000,000.00 as per the Third Claim for Relief (Violation of the First Amendment);

d) Ordering PREPA to expunge plaintiff's records of the false accusations immediately,

and prohibit criminal accusations from being filed, and all  defendants to pay plaintiffs a

sum in excess of $500,000.00 plus interest as per the as per the Fourth Claim for Relief

(Attacks on honor, family, and reputation);

e) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately,

and prohibit criminal accusations from being filed, and all defendants to pay plaintiffs a

sum in excess of $1,000,000.00 plus interest as per the as per the Fifth Claim for Relief

(Violation of the Fifth Amendment);

 f) Ordering PREPA to expunge plaintiffs' records of the false accusations immediately, and prohibit criminal accusations from being filed, and all defendants to pay plaintiffs a sum in excess of $1,000,000.00 plus interest as per the as per the Sixth Claim for Relief (Violation of Article II, Section II of the Puerto Rico Constitution);

g) Ordering defendants to pay plaintiffs the sum of $500,000 as per the Fifth Claim for Relief (Articles 1802, 1803 of the Puerto Rico Civil Code);

h) Ordering defendants to expunge each plaintiff's record of the false accusations, the threat of criminal prosecution of plaintiffs as per the Eighth Cause of Action;

i) Ordering defendants to cease and desist from any further discriminatory conduct;

j) Ordering the defendants in the respective causes of action to pay interest;

costs, and attorney's fees, pursuant to 42 USCA §2002-5(k); and,

k)      Granting such other and further relief as may be just and proper.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico this 26th day of August 2015.

LAW OFFICES OF
JANE BECKER WHITAKER
 /s/Jane Becker Whitaker
P.O. Box 9023914
San Juan, PR 00902-3914
Tel. (787) 754-9191
Fax (787) 764-3101
JANE BECKER WHITAKER
USDCPR Bar Number 205110